Filed 11/20/24  P. v. White CA2/2

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MALCOLM OMARI AKKIL WHITE,<br><br>    Defendant and Appellant. | B327099<br><br>(Los Angeles County<br>Super. Ct. No. BA468434) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

Malcolm Omari Akkil White (defendant) appeals from a judgment entered after he was convicted by jury of one count of pimping (Pen. Code, § 266h, subd. (a))[1] involving Symone H. Defendant argues on appeal that the trial court erred in failing to exclude sex advertisements of Symone, which were offered by the prosecution after Symone denied being involved in the commercial sex industry. We find no error and affirm.

## BACKGROUND

In an information filed by the District Attorney of Los Angeles County, defendant was charged with human trafficking of a minor for a commercial sex act (§ 236.1, subd. (c)(1); counts 1, 4, 6 & 12), human trafficking of a minor for a commercial sex act by force, fear, fraud, or threat of injury (§ 236.1, subd. (c)(2); counts 2 & 5), pimping (§ 266h, subd. (a); count 3), and dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 14). Defendant pled not guilty.

Codefendant Barrington Maxwell Williams was charged with seven counts of trafficking of a minor for a commercial sex act (§ 236.1, subd. (c)(1)) and one count of trafficking of a minor for a commercial sex act by force, fear, fraud, or threat of injury (§ 236.1, subd. (c)(2)).[2]

The matter went to trial by jury. The jury found defendant guilty of pimping Symone H. (count 3). The jury was unable to reach verdicts on the remaining seven counts.[3]

---

[1]     All further statutory references are to the Penal Code.

[2]     Codefendant Williams is not a party to this appeal.

[3]     The court declared a mistrial as to those counts.

The court sentenced defendant to the middle term of four years in state prison.  He was ordered to pay a $300 fine pursuant to section 1202.4, subdivision (b), and a $300 parole revocation fine, which was imposed or suspended, pursuant to section 1202.45.  The court also imposed a $40 court security fee pursuant to section 1465.8, subdivision (a)(1), and a $30 criminal conviction assessment pursuant to Government Code section 70373.  Defendant was awarded 2,014 days of actual credit and 2,012 days of good time/work time credits.

Defendant appealed from the trial court judgment.  Finding no error, we affirm.

**TRIAL EVIDENCE**

Symone H. was born in July 1999.  She met defendant when she was 17 years old and knew defendant for three years.  She had one daughter and denied defendant was the father.  Symone denied having sex with defendant, although she had feelings for him and wanted a sexual relationship with him.  Defendant told detectives he had known Symone for two years and had a child with her.

Defendant used the name "Greedy Dollas."  Defendant's codefendant went by the name "Sir Maxwell."  Symone denied using the name "Winter Dollas," but defendant told law enforcement Symone had used that name.  Symone had the tattoo "Greedy" above her left eyebrow with a "crown" above that.  The "crown" represents a sex worker's pimp.  Jordan C. testified if she were to work for defendant, she would "have to get a tattoo of his name to let it be known . . . that's who [she] was working for."  Jordan testified she was familiar with branding, and that meant having your pimp's moniker displayed somewhere

3

prominently on your person. T.C. testified the image on Symone's forehead was "the biggest brand you can get right on your face."

Symone denied working in the commercial sex industry. However, she later clarified she was moving away from commercial sex work. Symone had a Facebook account with the handle "Winter Dollas." Defendant used the handle "Greedy Dollas" on Facebook.

A.B. was born in February 1999. She used the name "Asia Dollas." A.B. had "Malcolm" tattooed above her eyebrow and "Dollas" on her cheek. A.B. was the "bottom bitch." The "bottom bitch" is the pimp's girlfriend. A.B. described her relationship with defendant as a "boyfriend and girlfriend relationship." Symone initially testified she never knew anyone named A.B. or Asia Dollas. However, she eventually started identifying photos of herself and A.B. Symone acknowledged A.B. referred to Symone as "wife" in a social media post. Symone also referred to A.B. as "wifey" in a social media post. Symone acknowledged the term "wife" or "wifey" is used to refer to two commercial sex workers who share the same pimp.

A.B. admitted working as a prostitute in the commercial sex industry, but denied defendant was her pimp and denied giving any of her earnings to defendant. A.B. acknowledged she worked with Symone, who A.B. considered her girlfriend and her best friend. A.B. denied Symone was her "wifey." A.B. identified herself in a photo with Symone in which they both displayed their tattoos associated with defendant along with the words "Free Dollas" and a crown symbol. The post was made after defendant was arrested. A.B. testified Symone did not become pregnant by defendant. At some point, A.B. and Symone stopped

4

being friends.  A.B. told a police detective she held the position of "bottom bitch," and Symone was vying for this position.  A.B. informed the detective Symone had supposedly become engaged to defendant and began spreading rumors about A.B. on Facebook.

T.C. was born in September 2000.  T.C. worked in "the game," which was the commercial sex industry.  In that industry, there are two groups, commercial sex workers and pimps.  T.C. used the name "Honey Dollas."  T.C. worked as a sex worker for defendant.  She also had a sexual relationship with defendant.  Defendant was T.C.'s boyfriend and pimp.  Defendant described T.C. as his girlfriend.

Defendant hit T.C.  A.B. also hit T.C.  On one occasion, T.C. fought defendant and A.B.  Defendant hit her multiple times.  T.C. sustained a black eye and vision loss.  Defendant also physically abused T.C. on other occasions.  Prior to her testimony, defendant called T.C. from jail multiple times.  T.C. said she was going to do what she wanted to do.  Symone initially denied knowing anyone named T.C. or Honey Dollas, but later acknowledged a conversation with A.B. in which they were discussing Honey Dollas.

Destiny M. also worked for Greedy Dollas.  Destiny went by the name "Drippy Bitxh."  On at least one occasion, T.C. and Destiny did a "two girl special" with a customer.

Jordan C. began working as a commercial sex worker when she was 17 years old.  "Do Dirty" was her pimp.  When Jordan C. was walking on "the blade," defendant approached her.[4]

---

[4]    A "blade" is where sex workers congregate to sell their services.

Defendant asked her if she had a pimp.  Defendant told Jordan C. if she chose to work for him she would have to get his name tattooed on her.  Jordan declined and defendant yelled and hit her.

Aj.B., who worked in the commercial sex industry, testified that defendant had two women, Winter Dollas and Asia Dollas.  Aj. had seen Winter Dollas working as a prostitute.

On July 9, 2017, Symone posted a photo of her Greedy tattoo and wrote, "NO makeup NO filter unlike these other hoes."  Symone had just turned 18 years old two days earlier.  Symone agreed that the term "hoe" refers to a sex worker in the commercial sex industry, but she claimed she did not use it that way.  A.B. commented with emojis.  Symone responded, "Thank you, wife."

On March 30, 2017, Symone had a conversation on Facebook with Sandra Tarasa.  Tarasa referred to Symone as "Hoe, Hoe."  Symone replied, "Yea."  Tarasa asked Symone if she was good.  Symone responded, "Girl, I got to get out of her [*sic*] for the safety of my child.  Imma call you when I touch down."  Tarasa again referred to Symone as "Hoe."  Tarasa asked Symone if she was "going to back to him" referring to defendant.  Symone said, "of course."

On or about February 11, 2017, Symone posted a photograph depicting her making a "kissy face" and being kissed by A.B.  Symone wrote a post to her "wifey" A.B. wishing her a happy birthday and ending with "Winter Dollas and Asia Dollas forever."  Symone was 17 years old at the time.

In another Facebook post, Symone told Nakia Moore that she could not go to her "P's" house without making some money.  The letter "P" refers to pimp in the commercial sex industry.

Symone, then age 17, made a Facebook post on June 24, 2017, where she wrote, "I need a king [emoji] not no lil boy [emojis]." "King" in the commercial sex industry refers to a pimp. Symone denied she was using the word in that context. Symone also posted, "Free Him [emoji] 304 plus 16 equals an unstoppable movement," with a high heel and money stack photos next to it. The number 16 represented the letter "p" which is the 16th letter of the alphabet. The symbol of the high heel refers to "walking the blade." Symone also had defendant's photograph and several photographs of herself in this post.

On May 20, 2020, Symone's photos were posted in a sex advertisement on the Megapersonals Web site.[5] The advertisement had the heading, "Good Girl with Naughty [emoji] Habits." It further read: "Sydney is here and ready for you now [emoji] Come get a taste of my SWEET personality [emojis] so sweet you'll want to come back for more [emoji] . . . Our time together is never rushed or wasted [emojis] your satisfaction is always guaranteed when it comes to me [emojis] SERIOUS INQUIRIES ONLY [emoji] PLEASE BE POLITE WHEN CONTACTING ME [emoji] BE CLEAN/GOOD HYGIENE IS A MUST [emoji] NO GFE NO BARE NO AA Hope to see you soon babe [emojis] incall/Outcall/car fantasy/Fetish Friendly."

Another sex advertisement posted on or about December 28, 2021, included photographs of Symone. The advertisement read, "Sexy Slut [emoji] Ready to Get Fucked [emojis] SPECIALS ALL Day." The advertisement also read: "The rain ain't the only thing wet [emoji] Outcalls Only [emojis]

---

[5]     The Megapersonals Web site advertised the services of commercial sex workers.

7

Warm & Wet Ready For You To Dive In [emojis] Selfie Verification Required [emoji] No Police [emoji] NO BARE ANYTHING [emoji] NO PIMPS [emoji] NO LOWBALLERS. [emoji] Be Real [emoji] Be Respectful. [emoji] Fetish Friendly [emojis]."

Symone acknowledged that "no bare" presumably meant no sex without a condom.  She acknowledged that "No AA" presumably meant no African Americans.  She testified that an outcall is when the sex worker travels to the location of the person purchasing the service, as opposed to an incall in which the person purchasing the service travels to the location of the sex worker.

Another advertisement was posted on or about January 25, 2022, including a photograph of Symone and text advertising commercial sex services.  The text of the advertisement read: "Outcalls Only [emoji] Outcalls Only [emoji] Do not inquire about my services if you are not ready to meet [emoji] You will be blocked and reported [emojis] Warm & Wet Ready For You To Dive In [emojis] Selfie Verification Required [emoji] No Police [emoji] NO BARE ANYTHING [emoji] NO PIMPS [emoji] NO LOWBALLERS. [emoji] Be Real [emoji] Be Ready [emoji] Be Respectful. [emoji] Fetish Friendly [emojis]."

## DISCUSSION

### I.    Relevant proceedings

Symone was called as a witness by the prosecution and began her testimony on Thursday, November 3, 2022.  At the start of her direct examination, Symone denied working in the

commercial sex industry. She also denied she had appeared in an advertisement for commercial sex workers.

The court was not in session on Friday, November 4, 2022, and Symone's testimony resumed on Monday, November 7, 2022. Prior to the start of her testimony, defendant's counsel informed the court he had received additional impeachment evidence for Symone from the prosecution on Saturday, November 5, 2022. Defendant's counsel objected to the evidence as late discovery.

The court inquired of the prosecution as to the nature of the recently shared discovery. The prosecutor replied it was "some sex acts not on social media, but on megapersonals and other commercial sex websites featuring the witness Symone." The prosecutor explained, "it's impeachment because the first question I asked Miss Symone in her testimony is has she ever worked in the commercial sex industry. She said, 'no.'" The prosecutor explained, "She further doubled down on that response by claiming she did not know any of the language or any practices or protocol within the commercial sex industry. She indicated that she was never in sex acts, et cetera. Essentially, she denied any connection to the commercial sex industry in any way, shape or form; and my detective was able to uncover some sex ads featuring this witness." The court inquired whether the evidence was "strictly for the impeachment that she is involved in the commercial sex industry," to which the prosecutor replied, "Correct." The prosecution clarified the evidence was not part of any prior discovery, but was "just uncovered by the detective over the weekend."

Defense counsel wanted to examine the evidence to see if it was authentic, to which the court responded, "Isn't that a question for the witness?" Defense counsel sought to have the

evidence excluded as a discovery violation. The court responded, "If the witness testified on Thursday to the statement 'I'm not involved in the commercial sex industry,' then the People are left in a position. At that point they have to prove she was involved in it."

The trial court ruled the evidence was not late discovery, reasoning, "When it's impeachment evidence, it is by definition something that is different than what the witness testifies to in trial; and the only way you are going to know what this witness testifies to at trial is when the witness testifies." The court added the prosecution was justified in looking for the impeachment evidence and bringing it in and overruled defense counsel's objection, stating, "the authentication will come from the witness."

The prosecution used the evidence in its examination of Symone, who denied posting the advertisements and denied being involved in the commercial sex industry.

## II.    Standard of review

We review the trial court's rulings on discovery violations for abuse of discretion. (*People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 987.) "Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) Before there can be reversal of a criminal conviction based on the erroneous admission of evidence, the appellant must show it is reasonably probable that, in the absence of the erroneously admitted evidence, a result more favorable to the defendant would have been reached. (*People v. Champion* (1995) 9 Cal.4th 879, 923, overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860; see *People*

10

*v. Watson* (1956) 46 Cal.2d 818, 836; see also Cal. Const., art. VI, § 13.)

### III. Discovery violation under sections 1054.1 and 1054.7

Defendant argues the trial court erred in concluding the prosecution did not commit a discovery violation under sections 1054.1 and 1054.7.

#### A. *Applicable law*

Section 1054.1 requires the prosecution to disclose to the defendant or his or her attorney certain "materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." The information required to be disclosed includes: "(a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] (b) Statements of all defendants. [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence." (*Ibid.*)

Section 1054.7 provides: "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred. 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement."

11

Section 1054.5 lists various sanctions a court may make to enforce the provisions of the chapter. Such sanctions include, but are not limited to, "immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (*Id.*, subd. (b).) Pursuant to section 1054.5, subdivision (c), the court may "prohibit the testimony of a witness . . . only if all other sanctions have been exhausted."

**B.** ***The trial court did not err in determining no discovery violation occurred***

Defendant argues the prosecution's failure to gather and present the evidence relevant to the prosecution witness's testimony until that prosecution witness was in the middle of her testimony amounted to a discovery violation under section 1054 et seq. Defendant acknowledges section 1054.7 permits disclosure of discovery less than 30 days before trial as long as the evidence is disclosed immediately upon receipt. However, defendant argues, section 1054.7 does not authorize additional discovery during trial. Accordingly, defendant argues, the prosecution was prohibited from relying on evidence discovered during trial.

We disagree that the cited statutes prohibit the admission of the sex advertisements discovered during trial. The Penal Code requires certain categories of evidence to be turned over to the defense at least 30 days before trial, "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." (§ 1054.1.) The categories of evidence required to be disclosed include names and addresses of witnesses; statements of the defendants; and "[a]ll relevant real evidence seized or obtained as

12

a part of the investigation of the offenses charged." (§ 1054.1, subd. (c).) The evidence in question was not seized or obtained as part of the investigation of the offenses charged. Instead, it was sought, and obtained, only after Symone denied involvement in the commercial sex trade. It was impeachment evidence, gathered immediately following Symone's direct testimony, in order to discredit such testimony. Because it was gathered during trial as impeachment evidence, it was not in the possession of the prosecution prior to trial. Thus, it was not among the categories of evidence required to be disclosed pretrial.

In interpreting section 1054 et seq., courts have acknowledged that "during the trial process, things change and the best laid strategies and expectations may quickly become inappropriate: witnesses who have been interviewed vacillate or change their statements; events that did not loom large prospectively may become a focal point in reality. Thus, there must be some flexibility." (*People v. Hammond* (1994) 22 Cal.App.4th 1611, 1624 (*Hammond*).) In *Hammond*, the Court of Appeal found no discovery violation where the prosecution presented a previously undisclosed witness as a rebuttal witness to a defense witness. (*Id.* at pp. 1617–1618, 1623–1624.) The *Hammond* court indicated "there is no general obligation to gather evidence," and "there was no requirement that the district attorney find a rebuttal witness to [certain] testimony." (*Id.* at p. 1624.)

Similarly, in *People v. Tillis* (1998) 18 Cal.4th 284, 288–289 (*Tillis*), the Supreme Court considered a situation in which the prosecution cross-examined a defense expert witness regarding the witness's previous arrest for drugs. During the recess, defense counsel complained he had not been given notice that the

13

prosecution intended to ask the witness about his arrest. (*Id.* at p. 289.) The Supreme Court reasoned, "because the record does not demonstrate the prosecutor failed to disclose any discoverable material, and the undisclosed impeachment information fell outside the scope of the discovery statute, no discovery violation appears . . . ." (*Id.* at pp. 290–291.) The high court noted that section 1054, subdivision (e) "precludes us from broadening the scope of discovery beyond that provided in the chapter or other express statutory provisions, or as mandated by the federal Constitution. Thus, if none of those authorities requires disclosure of a particular item of evidence, we are not at liberty to create a rule imposing such a duty." (*Tillis*, at p. 294.)

*Hammond* and *Tillis* suggest impeachment evidence, such as the sex advertisements at issue gathered after Symone's denial of involvement in commercial sex work, falls outside the requirements of section 1054 et seq. The sex advertisements were not "in the possession of the prosecuting attorney" or known "to be in the possession of the investigating agencies" prior to trial. (§ 1054.1.) Nor was it "seized or obtained as a part of the investigation" of the case. (§ 1054.1, subd. (c).) It was obtained only after trial started and was discovered only after Symone denied involvement in commercial sex work.

Defendant attempts to distinguish the above cases. First, he argues the evidence at issue was real evidence that directly supported an element of the charged offense. Further, the evidence was used for impeachment of a prosecution witness, not a defense witness. Based on these distinctions, defendant argues the prosecution's failure to gather and present the evidence until the prosecution witness was in the middle of her testimony amounted to a discovery violation. The distinctions defendant

14

creates do not exist in the statute, nor are they mandated by case law.  As the *Tillis* court required, we may not "broaden[] the scope" of the statute beyond what is expressly provided in its provisions.  (*Tillis, supra*, 18 Cal.4th at p. 294.)

Further, the record does not reveal that defendant's counsel showed a discovery violation as required under section 1054.5.  Section 1054.5, subdivision (b) provides, "Before a party may seek court enforcement of any of the disclosures required by this chapter, the party shall make an informal request of opposing counsel for the desired materials and information.  If within 15 days the opposing counsel fails to provide the materials and information requested, the party may seek a court order.  Upon a showing that a party has not complied with Section 1054.1 or 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."

Pursuant to section 1054.5, subdivision (c), "[t]he court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted."

Defendant did not show noncompliance with section 1054.1 or 1054.3.  Further, defendant did not seek a continuance, delay of the witness, or any other lesser sanction than exclusion of the evidence.  Because defendant failed to seek a lesser sanction,

15

exclusion of the evidence was inappropriate under the statutory scheme.[6]

The evidence was not in possession of the prosecution prior to trial, and was not gathered as part of the prosecution's investigation of the offenses charged but as evidence to impeach a witness. Thus, the trial court did not err in concluding no discovery violation warranting exclusion of evidence occurred.

## IV. Federal due process claim

Defendant forfeited his federal due process claim by failing to object to the admission of the sex advertisements on this ground. A party "may not argue that the court should have excluded the evidence for a reason different from his trial objection." (*People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*).) Thus, "[t]o the extent defendant argues that admission of the . . . evidence violated his federal constitutional rights to due process, . . . we find [that issue was] not preserved for appeal because defendant did not object at trial on those specific grounds." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)[7]

---

[6] While the record reveals that defense counsel articulated a need to examine the evidence to see if it was authentic, there is no record of a formal request for continuance, nor did the trial court interpret counsel's comments as such. Instead, counsel argued the evidence should be excluded.

[7] The *Partida* court articulated a "very narrow" exception to this rule. (*Partida, supra*, 37 Cal.4th at p. 435.) Under this exception, a defendant "may argue that the asserted error in admitting the evidence . . . had the additional legal consequence of violating due process." (*Ibid.*) However, the *Partida* court clarified that "the admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair." (*Id.* at p. 436.) Because defense counsel received the

16

Further, defendant has failed to show a federal due process violation. Defendant cites *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*), as support for his argument that due process requires the prosecution to disclose "evidence . . . material either to guilt or to punishment" to the defense upon request. "Under *Brady, supra*, 373 U.S. 83, and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709.) For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial. (*People v. Lucas* (2014) 60 Cal.4th 153, 274, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) "[A] true *Brady* violation occurs only when three conditions are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" (*People v. Lucas, supra*, at p. 274.)

The evidence at issue was not suppressed by the prosecution. The prosecution provided the evidence in question to defendant immediately upon its discovery. The exchange of evidence occurred during trial, before the direct examination of Symone had concluded and before defendant's cross-examination of Symone had begun. "*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial. To

---

evidence prior to the cross-examination of Symone, and had the opportunity to cross-examine Symone regarding such evidence, the admission of the evidence did not render the trial fundamentally unfair.

17

escape the *Brady* sanction, disclosure 'must be made at a time when disclosure would be of value to the accused.'" (*U.S. v. Gordon* (9th Cir. 1988) 844 F.2d 1397, 1403.) Here, because defendant had the opportunity to cross-examine Symone regarding the new evidence, the disclosure came at a time when the evidence could be of value to defendant.

Another aspect of suppression is that the evidence "is not suppressed unless the defendant was actually unaware of it and could not have discovered it '"by the exercise of reasonable diligence."'" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1049.) Thus, "if the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence." (*Ibid.*) Symone's sex advertisements on public Web sites were equally available to the defense. Thus, defendant's only reason for not obtaining them was his lack of interest or due diligence. (See, e.g., *People v. Morrison* (2004) 34 Cal.4th 698, 715 ["the prosecutor had no constitutional duty to conduct defendant's investigation for him"].)

Even if defendant had not forfeited his federal due process claim, for the reasons set forth above we would have concluded no *Brady* violation occurred.[8]

## V.    Ineffective assistance of counsel

To the extent this court finds any of defendant's arguments forfeited, defendant argues he received ineffective assistance of

---

[8]    Because we have found defendant forfeited his federal due process claim and failed to show suppression, we decline to address the party's competing arguments regarding prejudice.

18

counsel under both the federal and state Constitutions.  Because we have concluded defendant forfeited his federal due process claim, we address the ineffective assistance of counsel argument.

### A.    *Applicable law*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  This right entitles the defendant to effective assistance.  (*Ibid.*)  To prevail on a claim of ineffective assistance of counsel, the defendant must show two prongs.  First, the defendant must show counsel's performance was deficient.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  Second, the defendant must show prejudice as a result of the deficient performance.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Ibid.*)

"Judicial scrutiny of counsel's performance must be highly deferential." (*Strickland, supra*, 466 U.S. at p. 689.)  Thus, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Ibid.*)  When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged act or omission, the conviction must be affirmed unless there could be no satisfactory explanation.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

**B.    *Analysis***

Defendant claims counsel's failure to argue the admission of the sex advertisements violated his due process rights and constituted ineffective assistance of counsel.  He adds the argument was meritorious, and there was no reasonable strategy for counsel's failure to present the argument in light of counsel's desire to exclude the evidence.  Defendant cites *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1131, where the court found "since defendant's trial counsel *did* in fact object to the introduction of the statements, albeit on nonmeritorious grounds, this fact underscores our conclusion that there could have been no tactical reason for counsel's failure to make a *meritorious* objection to the same evidence."  Defendant also argues the admission of the evidence was prejudicial.

We decline to find ineffective assistance of counsel on the record before us.  Defense counsel objected to the advertisements in question on the ground that the late discovery constituted a discovery violation.  Defense counsel did not object on the ground that the admission of the evidence constituted a federal due process violation.  The record does not reveal why defense counsel declined to make a due process objection.  Because the record does not reveal counsel's rationale, we must assume counsel had a tactical reason for failing to make a due process objection.  "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069.)

There is a satisfactory explanation as to why defendant's counsel chose not to object to the admission of the sex advertisements on federal due process grounds. As set forth in detail above in part IV, even if such an objection had been made, it would not have had merit. A *Brady* violation occurs only when the evidence at issue is favorable to the accused; the evidence is suppressed by the State, either willfully or inadvertently; and prejudice has ensued. (*People v. Lucas, supra*, 60 Cal.4th at p. 274.) Defendant failed to show the prosecution suppressed the sex advertisements because the prosecution handed the advertisements over upon their discovery. Further, the advertisements were public record and could have been found by the defense with reasonable diligence. We decline to find defense counsel ineffective for failing to make a meritless objection.[9]

## DISPOSITION

The judgment is affirmed.

_____
CHAVEZ, J.

We concur:

_____        _____
ASHMANN-GERST, Acting P. J.        HOFFSTADT, J.

---

[9] Because we have found defense counsel's performance was not deficient, we decline to address the element of prejudice.

21